# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| CANTERBURY CROSSING HOMEOWNERS' ASSOCIATION, INC., | ) ) ) | |
| Appellant, | ) ) | |
| v. | ) ) | C.A. No. K22A-04-002-NEP |
| CANTERBURY CROSSING MHC, LLC, | ) ) ) | |
| Appellee.[1] | ) ) | |

Submitted:  October 28, 2024
Decided:  November 6, 2024
Public Version Issued:  November 19, 2024

## OPINION

*Upon Appeal from the Decision of the Arbitrator*

**AFFIRMED**

Anthony V. Panicola, Esquire, and Olga K. Beskrone, Esquire, Community Legal Aid Society, Inc., Dover, Delaware, *Attorneys for the Appellant*.

Robert J. Valihura, Jr., Esquire, David C. Zerbato, Esquire, and Caren L. Sydnor, Esquire, Morton, Valihura & Zerbato, LLC, Greenville, Delaware, *Attorneys for the Appellee*.

**Primos, J.**

---

[1] Although the Notice of Appeal lists the Delaware Manufactured Home Relocation Authority (the "Authority") in the caption under the name of the appellee, Canterbury Crossing MHC, LLC, neither the caption nor the Notice itself designates the Authority as an appellee, and the Authority would not have been properly joined even had it been so designated.  *See* 1 *Del. Admin. C.* § 202-8; 25 *Del. C.* § 7054.  Moreover, the Authority did not participate in the briefing of this matter.  Therefore, the Court has not listed the Authority in the caption.

Canterbury Crossing Homeowners' Association appeals the decision of an arbitrator approving an increase to market rent pursuant to the Rent Justification Act.[2] The appellant contends that the arbitrator made errors of law and based his decision on insufficient evidence. The Court today determines that the arbitrator's decision was supported by substantial evidence and that any errors of law were harmless. Therefore, the Court **AFFIRMS** his decision.

## I. BACKGROUND[3]

### A. Facts

Canterbury Crossing (the "Community") is a 157-lot manufactured home community near Felton, Delaware.[4] The Community is owned by Canterbury Crossing MHC, LLC (the "Landlord").[5] Canterbury Crossing Homeowners' Association, Inc. (the "HOA") represents residents of the Community.[6] In the spring and summer of 2021, the Landlord commissioned a contractor to alleviate flooding in parts of the Community, including common roadways.[7] The Landlord hired a second contractor to regrade parts of the area affected by this work and to lay new

---

[2] The Rent Justification Act (the "Act") is a rent control statute that attempts to balance the interests of community owners and of manufactured home owners renting lots from them. The Act limits rent increases to the rate of inflation, absent one of eight justifications for increasing the rent further. When one of these justifications is cited by a community owner, homeowners (or any HOA acting on their behalf) may petition the Delaware Manufactured Home Relocation Authority to appoint an arbitrator. The arbitrator's determination of whether the above-inflation rent increase is justified may be appealed to this Court. *See* Section III, *infra*.

Subsequent to the events giving rise to this appeal, the General Assembly amended the Act. *See* 83 Del. Laws ch. 341 § 4 (2022). Unless otherwise indicated, all references to the Delaware Code are to the Code as it existed prior to this amendment.

[3] Citations in the form of "A___" refer to a page of the Appendix to Appellant's Opening Brief. Citations in the form of "D.I. ___" refer to docket items.

[4] A0581.

[5] *Id.*

[6] A0582.

[7] A0371–73; A0379–80; A0383.

asphalt.[8]  The cost of the two projects totaled $33,212.90.[9]

On June 30, 2021, the Landlord mailed notices to homeowners of its intent to raise each homeowner's rent to a market price of $505.00 per month, plus 1.767% of the prior rate (derived from the CPI-U[10] inflation metric).[11]  The notices also informed homeowners of their current rent, the new rate (to take effect on October 1, 2021), and that the Landlord would meet with them just under thirty days later, on July 29, 2021, "to discuss the reasons for the increase."[12]  The notices told residents how to attend the July 29 meeting (telephonically or via Zoom video conferencing) and receive hard copies of the Landlord's presentation (from the Community office).[13]

On July 1, 2021, the Landlord's counsel notified the executive director of the Delaware Manufactured Home Relocation Authority (the "Authority") that "in accordance with regulations, all affected tenants have been informed of a proposed price increase."[14]  This letter included an example of the notices sent to the homeowners and a list of all homeowners affected, including their names and addresses.[15]  This list did not include the current rent paid by each tenant.[16]  The Landlord's counsel copied the HOA on the letter.[17]

Around the time that the contractors' work was completed, the Landlord's

---

[8] A0374; A0381–82.
[9] A0381–83; A0584.
[10] "CPI-U" is shorthand for the measure ordinarily used to cap annual rent increases under the Act: the "Consumer Price Index For All Urban Consumers in the Philadelphia-Wilmington-Atlantic City area."  *See* 25 *Del. C.* § 7052(a); *see also* Section III, *infra*.
[11] A0001–304.
[12] *Id.*
[13] *Id.*
[14] A0343–48; A0595.
[15] A0343–48; A0595–96.
[16] A0343–48; A0595–96.
[17] A0597.

counsel commissioned a "fair market rent analysis"[18] from a certified real estate appraiser[19] (the "Appraiser").  The Appraiser's report considered the rents charged to the last ten households to enter the Community ($505.00 per month) as well as rents charged at six other communities "within the competitive area" that "offer[ed] similar facilities, service, amenities and management."[20]  These communities' rents were then adjusted on the basis of six factors to better approximate an "apples-to-apples" comparison.[21]  Through this analysis, the Appraiser concluded that the fair market rent for lots in the Community ranged from $505.00 to $525.00 per month.[22] The report did not consider any flooding issues in the Community:  the Appraiser stated that he was unaware of these issues, but that such knowledge would not have affected his analysis.[23]  Neither did the report differentiate between leases of vacant lots and leases of lots on which manufactured homes were already located.[24]

The Landlord's July 29 PowerPoint presentation contained the following information: the effective date of the increase;[25] a brief explanation of the rent justification process and the showing required of the Landlord;[26] the basis on which the Landlord was justifying the increase (market rent);[27] why the Landlord believed it had complied with the requirements of the Act;[28] proof of the work done and

---

[18] *See* A0437–96.
[19] *See* A0497–98 (laying out the Appraiser's resume and licenses); A0822–27 (excerpt from hearing transcript covering the same).  *See also* A0590 n.36 (noting that the Appraiser was "qualified as [an expert] witness with no objection."); a*ccord* A0827 (excerpt from transcript of hearing in which the Appraiser was so qualified).
[20] A0386; A0391–410; A0412.
[21] A0406–09.  These factors were "conditions of rental agreement," "time" (*i.e.*, changed market conditions since the leases were signed), "location," "quality," "condition," and "utilities included in rent." *Id.*
[22] A0412.
[23] A0593; A0887–88.
[24] A0589–93.
[25] A0352.
[26] A0353–59; A0361–64.
[27] A0360.
[28] A0361–69.

4

expenses incurred;[29] portions of the Appraiser's report;[30] and the residents' right to pursue arbitration.[31] Following the meeting, the Landlord's community manager personally handed the president of the HOA a copy of the Landlord's presentation.[32]

Despite the Landlord's efforts to remedy the Community's flooding issues, both the community manager and representatives of the HOA agreed that the issues remained partially unresolved.[33] Witnesses gave different impressions as to whether the situation had been improved by the contractors' work, how extensive the problem was, and whether the issue was intractable.[34]

Once the arbitration process commenced, the Landlord provided the HOA with a copy of the notice letters sent to every affected address on June 30, 2021.[35] A review of the homeowners' prior rents, as listed in these letters, reveals that a rent increase to $505.00 per month netted the Landlord an additional $74,322.36 per year.[36]

## B. Procedural History

The HOA, representing 97 sets of homeowners, filed a petition with the Authority

---

[29] A0370–83.

[30] A0384–412.

[31] A0418.

[32] A0953 (testifying to this effect).

[33] A0960 (concession of the community manager to this effect); A1027 (testimony by HOA vice president that the flooding was "worse" after the Landlord commissioned the contractors); A1121 (statement by the HOA president that the flooding was not improved).

[34] A0939 (community manager's statement that the drainage had been "improved"); A0960 (community manager's testimony that there was "nothing that [could] be done" to address flooding on residents' lots); A1027, A1029–66, A1075–78 (HOA vice president's discussion of the continued flooding issues); A1121–23, A1126–29, A1135 (HOA president's discussion of the continued flooding issues).

[35] A0001–304.

[36] Id.

to challenge the rent increase, and the Authority appointed an arbitrator (the "Arbitrator").[37] The parties engaged in limited discovery.[38] Following a hearing, the Arbitrator issued a decision on March 28, 2022, approving a rent increase to $505.00 per month but denying an additional adjustment for the CPI-U.[39]

The HOA filed a notice of appeal to this Court on April 25, 2022.[40] On June 7, 2022, the Court issued a stay of the appeal pending the issuance by the Superior Court of a decision as to certain confidentiality issues in *Ridgewood Manor MHC, LLC v. Ridgewood Manor HOA*, C.A. No. K21A-10-002 RLG ("*Ridgewood Manor*").[41] Following the Court's decision on confidentiality issues in *Ridgewood Manor*, the parties entered into a stipulation and proposed order governing confidential information, which the Court approved on November 10, 2022.[42]

On April 6, 2023, the Court again stayed proceedings pending the Supreme Court's decision in *Shady Park Homeowners' Association, Inc. v. Shady Park MHC, LLC*.[43] The Supreme Court decided *Shady Park* on October 31, 2023.[44] Thereafter, the parties stipulated to a briefing schedule, and briefing followed.[45]

Following the submission of briefs by the parties, the Court discovered that the Authority had never filed the record with the Court and that, due to a clerical error

---

[37] A0582.
[38] *Id.*
[39] A600–A0601. The Arbitrator found that the Landlord had not imposed the additional increase, and that it had waived its argument on this point. *Id.* The Landlord has not challenged either finding on appeal.
[40] D.I. 1.
[41] D.I. 13.
[42] D.I. 18.
[43] D.I. 24.
[44] *Shady Park Homeowners' Ass'n, Inc. v. Shady Park MHC, LLC*, 308 A.3d 168, 2023 WL 7151197 (Del. Oct. 31, 2023) (ORDER).
[45] *See* D.I. 35–39, 41–42. Because this case is subject to an order governing confidential information, the docket contains both public and sealed versions of filings—notably, the parties' briefs—with and without redactions. *See* D.I. 18.

in the Prothonotary's Office, this missing filing had not been previously identified.[46] The Prothonotary's Office reached out to the Authority regarding the missing filing, and the Authority then filed what it purported to be the paper record in this case.[47] However, the Authority subsequently informed Prothonotary staff that the Authority was in possession of several hundred pages of additional material in electronic format, also purportedly part of the record, that the Authority had no ability to print out and file with the Prothonotary. A representative of the Authority then submitted to the Prothonotary's Office, without request from or authorization by that office, a "thumb drive" purportedly containing the additional material in electronic format.

On September 17, 2024, the Court met with counsel for the HOA and the Landlord and informed them of what had transpired regarding the status of the record. The Court explained that it had not accessed the material on the "thumb drive," and could not do so pursuant to its normal procedures.[48] The Court further explained to counsel that it was imperative to define the record and establish its integrity should the matter be subject to further appeal to the Delaware Supreme Court. Counsel suggested, and the Court agreed, that counsel would confer with one another and with the Authority regarding the record and would work to ensure that a proper record was filed with the Court.[49]

On October 11, 2024, counsel for the Authority filed correspondence with the Court indicating that, upon consultation with counsel for the HOA and the Landlord, the Authority was willing to certify that the Appendix filed by the HOA in

---

[46] The Authority was required to file a paper copy of the certified record in this case pursuant to Superior Court Civil Rule 72(e) and Superior Court Administrative Directive 2011-4.

[47] D.I. 44.

[48] Attempting to access the material on the "thumb drive" using the Court's information systems could have exposed those systems to, *e.g.*, viruses or other malware.

[49] As explained at the conference, this would include ensuring that any material was properly redacted to comport with earlier orders in the case regarding confidentiality of materials.

conjunction with the Opening Brief constituted the record in the case.[50] On October 16, 2024, the Court conferred with counsel for the HOA, the Landlord, and the Authority, and raised the issue that the Appendix filed by the HOA, referenced by the Authority in its October 11 correspondence as Docket Item 35, had been filed under seal, but that the record maintained by the Prothonotary's Office would be accessible to the public. The Court suggested, and counsel for all parties agreed, that the parties file a stipulation and proposed order clarifying that the record would be the HOA's Appendix as filed under seal, but that the public version of the HOA's Appendix (Docket Items 36 and 37) would be filed and maintained in paper form in the Prothonotary's Office to comply with the Court's prior orders regarding confidentiality. The parties subsequently filed a stipulation and proposed order, which the Court approved on October 23, 2024,[51] and a paper copy of the public version of the Appendix was filed in the Prothonotary's Office on October 28, 2024.[52]

## II.    STANDARD OF REVIEW

25 *Del. C.* § 7054 provides that an appeal from the decision of an arbitrator "shall be on the record and the Court shall address written and/or oral arguments of the parties as to whether the record created in the arbitration is sufficient justification for the arbitrator's decision and whether those decisions are free from legal error."[53] The Supreme Court has interpreted this language to mandate substantial evidence review.[54]

---

[50] D.I. 49. Prior to October 11, 2024, counsel for the Authority had not entered an appearance or otherwise participated in the appeal. *See* Note 1, *supra*.

[51] D.I. 54.

[52] D.I. 56.

[53] 25 *Del. C.* § 7054.

[54] *Rehoboth Bay Homeowners' Ass'n v. Hometown Rehoboth Bay, LLC*, 252 A.3d 434, 441 (Del.

8

Under this standard, closely paralleling the statute, the reviewing court must "ask 'whether there is substantial evidence in the record to support the [arbitrator's] findings and whether such findings are free from legal error.'"[55] "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion."[56] When conducting substantial evidence review, the Court is "require[d]" to "search the entire record."[57]

Issues of statutory construction and interpretation are reviewed *de novo*.[58] When conducting *de novo* review of a statute's interpretation, the Court's purpose is to "determine and give effect to the legislature's intent."[59]

## III. THE RENT JUSTIFICATION ACT

The Rent Justification Act (the "Act,") codified in Title 25, Chapter 70 of the Delaware Code, seeks to balance two conflicting imperatives: "protecting manufactured homeowners, residents, and tenants from unreasonable and burdensome space rental increases, while simultaneously providing for the need of manufactured home community owners to receive a just, reasonable, and fair return on their property."[60] The General Assembly was evidently concerned that, after a manufactured homeowner had placed his or her home on a leased "pad" or "lot," the

---

2021).

[55] *Id.* (quoting *Murphy & Landon, P.A. v. Pernic*, 121 A.3d 1215, 1221 (Del. 2015)) (alteration in original).

[56] *Id.* (quoting *Murphy*, 121 A.3d at 1221).

[57] *National Cash Register v. Riner*, 424 A.2d 669, 674–75 (Del. Super. 1980); *accord Fasano v. Delaware Dep't of Nat. Res. & Env't Control*, 2024 WL 469638, at *2 (Del. Super. Feb. 2, 2024); *Hudson v. Beebe Med. Ctr.*, 2024 WL 36063, at *5 (Del. Super. Jan. 3, 2024).

[58] *Sandhill Acres MHC, LC v. Sandhill Acres Home Owners Ass'n.*, 210 A.3d 725, 728 (Del. 2019) (citing *Bon Ayre Land, LLC v. Bon Ayre Community Ass'n (Bon Ayre II)*, 149 A.3d 227, 233, n.21 (Del. 2016)).

[59] *Wild Meadows MHC, LLC v. Weidman*, 250 A.3d 751, 756 (Del. 2021); *accord Bon Ayre II*, 149 A.3d, at n.21 (Del. 2016).

[60] 25 *Del. C.* § 7050.

9

community owner would have "disproportionate power in establishing rental rates."[61]  In essence, because it was difficult and costly for homeowners to relocate, the Assembly feared that community owners might exploit their positions by dramatically and unreasonably increasing their tenants' rent.[62]

The Act contains a variety of substantive protections for the owners of manufactured homes.  Key to this appeal is the "rent justification" process.  Under the Act, community owners may increase their tenants' rents only once every twelve months,[63] and ordinarily only in accordance with the CPI-U.[64]  In other words, rent increases cannot ordinarily exceed the rate of inflation.  A landowner may, however, increase the rent above the CPI-U rate if the owner has not been found to have committed a health and safety violation within the preceding twelve months;[65] the rent increase is "directly related to operating, maintaining, or improving the manufactured home community;" and the increase is justified by one or more of certain enumerated factors.[66]  One of these justifying factors, at issue in this case, is "market rent," or "rent that would result from market forces absent an unequal bargaining position between the community owners and the homeowners."[67]

After a community owner notifies homeowners of an above-CPI-U rent increase and holds a final meeting to explain the basis for that increase, affected homeowners may (individually or through an HOA) petition the Authority to appoint an arbitrator.[68]  If the arbitrator determines that the rent increase is not justified, the community owner must rebate the additional money collected pursuant to that

---

[61] *Id.*
[62] *Id.*
[63] 25 *Del. C.* §§ 7051, 7052(a).
[64] 25 *Del. C.* § 7051.
[65] 25 *Del. C.* § 7052(a)(1).
[66] 25 *Del. C.* § 7052(a)(2).
[67] 25 *Del. C.* § 7052(c)(7).
[68] 25 *Del. C.* § 7053(f).

increase.[69]  The community owner, the HOA, or any affected homeowner may appeal the arbitrator's decision to this Court.[70]  This appeal "shall be on the record and the Court shall address written and/or oral arguments of the parties as to whether the record created in the arbitration is sufficient justification for the arbitrator's decisions and whether those decisions are free from legal error."[71]

## IV.  ANALYSIS

### A. No Statute Or Regulation Provides A Remedy For A Landlord's Insufficient Initial Notice To The Homeowners' Association

In addition to the provisions previously set out, the Act contains specific notice requirements.  Relevant here, the Act requires that a landlord provide each affected homeowner, the Authority, and any homeowners' association with notice of a rent increase at least ninety days before that increase is to take effect.[72]  The Act sets forth the minimum requirements for such notice.[73]  The Authority has subsequently promulgated regulations that, among other things, require that additional material be included in this initial disclosure.[74]  The HOA contends that the notice it received was insufficient under these regulations, and that the Court should overturn the Arbitrator's decision as a result.[75]

1 *Del. Admin. C.* § 202-4 provides, in relevant part, as follows:

A community owner is required to give written notice to each affected home owner, to the Home Owner's Association, if one exists, and to

---

[69] 25 *Del. C.* § 7053(l).

[70] 25 *Del. C.* § 7054.

[71] *Id.*

[72] 25 *Del. C.* § 7053(a)(1).

[73] *See generally* 25 *Del. C.* § 7053(a).

[74] 1 *Del. Admin. C.* § 202-4.  The Supreme Court has previously recognized the Authority's power to promulgate such regulations.  *See Weidman*, 250 A.3d at 757.  Neither party contests the validity of the regulation at issue in this case.

[75] Appellant's Opening Br. at 10–18.

the Authority, at least 90 days prior to any increase in lot rent. When more than one tenant is affected by the rent increase, in lieu of providing the HOA or the Authority with copies of each letter sent to each affected tenant, the community owner shall provide the HOA and the Authority with a summary letter . . . . certifying that written notice has been sent to each affected home owner together with a copy of the form of notice provided . . . [and] (with respect to each affected home owner) state whether or not the proposed rent increase exceeds the CPI-U and provide . . . the current monthly lot rent[.]

In this instance, although the Landlord's notice identified each affected homeowner to the HOA and the Authority, it failed to "state whether or not [each homeowner's] proposed rent increase exceed[ed] the CPI-U" and failed to provide each homeowner's "current monthly lot rent."[76] As such, the Landlord failed to comply fully with the regulation, as the Arbitrator concluded in his opinion.[77] The record, which includes a copy of the notice sent to the HOA and the Authority,[78] provides substantial evidence in support of this finding.

The Arbitrator further found that the notice defect was not remedied by later disclosure because the statute and regulation required that the information be turned over at least ninety days before the rent increase.[79] This finding was free of legal error. Nonetheless, the Arbitrator declined to deny the rent increase on this basis because the Landlord had "substantially complied" with its notice obligations, while the "use of hyper-technicalities" to defeat rent increases would "unfairly benefit the homeowners" and run contrary to the Act's dual purposes."[80]

The Court need not address the HOA's critiques of the Arbitrator's reasoning on this issue. Any legal error on the Arbitrator's part is rendered harmless by this Court's opinion in *Shady Park*, which was affirmed by the Supreme Court "on the

---

[76] 1 *Del. Admin. C.* § 202-4; A0343.
[77] A0597.
[78] A0343–48.
[79] A0598.
[80] A0599.

12

basis of and for the reasons stated in the Superior Court's . . . Memorandum Opinion."[81] In *Shady Park*, the Court noted that no provision of the Act or Delaware Administrative Code "set[s] forth any sort of punishment for non-compliance with the initial notice requirements" of the Act.[82] Moreover, the standards contained in 25 *Del. C.* § 7052, which guide arbitrators in their duties, neither "state nor allude to a partial non-compliance with the initial notice requirements equating to an automatic forfeiture of an above CPI-U increase in rent" to which the landlord would otherwise be entitled.[83] Thus, neither the Arbitrator nor this Court has statutory authority to deny a market-rate rent increase on the basis of an insufficient initial disclosure.

The HOA attempts to distinguish *Shady Park* by claiming, for the first time on appeal, that the Landlord "purposely"[84] chose not to provide the notice required by the regulation.[85] Appellant contends that this is evident from the Landlord's counsel having been involved in two prior cases under the Act that put the initial notice requirements at issue.[86] On this basis, they conclude that the Landlord, "through its attorney, was fully aware of the notice requirements mandated by law."[87] Even assuming that purposeful concealment would be grounds for rejecting *Shady Park*'s statutory interpretation—a conclusion that the Court does not reach today—the HOA has not shown that the Landlord's counsel were anything more than negligent in failing to include the required information. The Arbitrator made no factual findings on this question, and the Court declines to make a finding of its

---

[81] *Shady Park Homeowners' Ass'n, Inc. v. Shady Park MHC, LLC*, 2023 WL 2366643, at *3–4 (Del. Super. Mar. 3, 2023), *aff'd*, 308 A.3d 168, 2023 WL 7151197 (Del. Oct. 31, 2023) (ORDER).
[82] *Shady Park*, 2023 WL 2366643, at *4.
[83] *Id.*
[84] Appellant's Reply Br. at 3.
[85] Though not explicit in the HOA's brief, the allegation seems to be that the Landlord hoped to discourage homeowners from joining any subsequent arbitration.
[86] Appellant's Reply Br. at 3–4 (D.I. 41–42).
[87] *Id.* at 4.

own. The record contains no indication that either the HOA or the Authority objected to the sufficiency of the initial disclosure at the time it was made. Such objection would have put the Landlord and its counsel on notice, thereby making the omission of residents' rent rates less easily excusable.

Notwithstanding *Shady Park*, Appellant urges the Court to find in its favor for the reasons stated in *Tunnell Companies, L.P. v. Greenewalt*.[88] In *Tunnell*, this Court denied a landlord's proposed rent increase because the landlord failed to disclose "all relevant material information."[89] The HOA's argument has two principal deficiencies. First, the "material information" and "material factors" referenced in *Tunnell* are not those facts required to be in the initial notice, but, rather, those that the Act requires be disclosed "at or before the final meeting" between the landlord and homeowners.[90] Second, Appellant's argument ignores that "material factors" are those that, in the terms of the Act, "result[ed] in the decision to increase the rent."[91] At issue in *Tunnell* were "reports on comparable manufactured home communities" that "led [the landlord] to determine that it needed to increase rent above the CPI-U."[92] The contents of these reports were rendered material only because the landlord relied on them in determining the market rent rate.[93]

The facts of this case are distinguishable from *Tunnell*. Here, the Appraiser disclosed and thoroughly explained the material factors underlying his market-rate determination at the final meeting between the landlord and homeowners.[94] On

---

[88] 2014 WL 5173037 (Del. Super. Oct. 14, 2014).

[89] *Id.* at *5–6.

[90] *See* 25 *Del. C.* § 7053(c) ("At or before the final meeting the community owner shall, in good faith, disclose in writing all of the material factors resulting in the decision to increase the rent."); *Tunnell*, 2014 WL 5173037, at *3.

[91] 25 *Del. C.* § 7053(c); *Tunnell*, 2014 WL 5173037, at *3.

[92] *Tunnell*, 2014 WL 5173037, at *5.

[93] *Id.*

[94] *See* A0371–83 (section of Landlord's presentation to homeowners detailing the work completed); A0386 (section stating the rent paid by the last ten new tenants); A0388–412 (section

14

much the same facts as the present case, and for this reason, *Shady Park* distinguished *Tunnell*: "[T]he Owner complied with the requirements of holding a final meeting with the community. At that final meeting an extensive PowerPoint presentation was displayed explaining the material factors used in the decision for the rent increase above the CPI-U level, including the Market Rent Analysis Report."[95] The analogy to *Tunnell* is, as in *Shady Park*, inapt. As in *Shady Park*, the Court declines to extend *Tunnell*'s holding beyond the scope of its statutory basis.

## B. The Arbitrator's Finding That The Landlord Fulfilled The Statutory Requirements For An Above-CPI-U Rent Increase Is Supported By Substantial Evidence, And Any Legal Error Was Harmless

In order to "open the door" to an above-CPI-U rent increase under the Act, a landlord "need only show that there were no relevant health or safety violations and that '[t]he proposed rent increase is directly related to operating, maintaining or improving the manufactured home community.'"[96] In this case, the Arbitrator found, on the basis of substantial evidence and without dispute by the HOA, that there were no relevant health or safety violations.[97] Admittedly, the Arbitrator erred as a matter of law by failing to consider whether the rent increase was proportional to the expenditure, as was required to determine that it was directly related to operating, maintaining, or improving the Community. Despite this oversight, the

---

detailing the findings and methodology of the Appraiser's report). The Landlord also apparently made physical copies of the presentation available to community members, and specifically handed one to the president of the HOA. A0001–304; A0953.

[95] *Shady Park*, 2023 WL 2366643, at *3.

[96] *Sandhill*, 210 A.3d at 727 (quoting 25 *Del. C.* § 7052(a)(2)).

[97] A0582.

Arbitrator ultimately concluded that the rent increase was "directly related."[98] On appeal, the record is sufficient to show that this conclusion was supported by substantial evidence in light of the proper legal test.[99] Thus, any error on the Arbitrator's part was harmless.

## 1. The Arbitrator's conclusion that the Community was free of any health and safety violations was free of legal error and supported by substantial evidence.

25 *Del. C.* § 7052(a)(1) requires that a community owner, prior to obtaining a rent increase above the CPI-U average, demonstrate that "[t]he community owner, during the preceding 12-month period, has not been found in violation of any provision of [the Act] that threatens the health or safety of the residents, visitors, or guests that persists for more than 15 days . . . ."[100]

The Arbitrator found that the Landlord met this burden for three reasons: (1) during the July 29 final meeting between the Landlord and homeowners, the Landlord asserted that it was free of any health or safety violations; (2) the regional director overseeing the community for the Landlord "testified that she was unaware of any outstanding health and safety violations and that she would have been aware of such violations if the [Landlord] received the same"; and (3) the on-site community manager "testified that there were no outstanding health and safety

---

[98] A0588.

[99] In reaching this conclusion, the Court summed the rent increases included in the notices sent to each affected homeowner. This total figure was not included in the Arbitrator's report. The Court finds that a remand instructing the Arbitrator to perform this mathematical calculation would be purely ministerial, needlessly delay the proceeding, and contravene the goal of judicial economy, since the figure is easily calculated and supports the Arbitrator's decision. *Cf. Bartlett v. State*, 249 S.W.3d 658, 667 (Tex. Ct. App. 2008) ("Where . . . the trial court did not make explicit written findings of fact, we view the evidence in the light most favorable to the trial court's rulings and assume that the trial court made implicit findings of fact that are supported by the record.").

[100] 25 *Del. C.* § 7052(a)(1).

violations at the community at the time the rent increase was sent out."[101]  Each of these findings correctly summarized the evidence presented and was accompanied with an accurate citation to the record.  While some of the evidence cited by the Arbitrator did not directly pertain to the statutory requirements, their satisfaction was a fair inference from the evidence the Landlord presented.[102]  Further, as the Arbitrator noted, the HOA "provided no evidence" of any relevant violation.[103]  The HOA does not contest the Arbitrator's finding on appeal, and it is supported by substantial evidence.

> **2. The rent increase at issue was directly related to operating, maintaining, or improving the community, because the Landlord made a material expenditure for a capital improvement, the rent increase was not disproportionate, and the Landlord saw its costs increase as a result.**

The Supreme Court has held that a *prima facie* case that a rent increase is "directly related" to operating, maintaining, or improving a community rests on two interrelated elements:  (1) the expenditure must be material; and (2) the rent increase must be proportionate to the amount spent such that there is a "substantial relationship" between the two.[104]  The Landlord in this case has easily satisfied both elements, as the HOA concedes.[105]

---

[101] A0582.

[102] *Cf. Donovan Smith HOA v. Donovan Smith MHP, LLC*, 190 A.3d 997, 2018 WL 3360585, at *1 (Del. 2018) (ORDER) ("Although the Landowner did not present evidence of what these improvements cost, the arbitrator was charged with addressing the evidence in front of him and making fair inferences from it.").

[103] A0582.

[104] *Sandhill*, 210 A.3d at 730.

[105] Appellant's Reply Br. at 6 (D.I. 41–42) ("In its answering brief, [the Landlord] dedicates six pages of hyperbole in support of the claim that it met its *prima facie* case at arbitration.  The HOA has not disputed this before this Court and concedes that [the Landlord] has met its initial burden.") (internal citation omitted).

### i. The Landlord's expenditure was material.

The Landlord justifies its rent increase by referencing the $33,212.90 it spent to reduce flooding in the Community's common spaces, such as its roadways.[106] The Landlord provided substantial evidence that these monies were spent, including copies of invoices, proof of payment, and photographs of the completed work.[107] The Arbitrator, though not fully explaining his reasoning, found that this was a material capital expenditure.[108] Whatever the inadequacies of the logic employed, the conclusion itself is free of legal error. *Sandhill* involved an expenditure of only $12,185, which the Supreme Court found to be material.[109] The *Sandhill* Court, though reiterating that the materiality threshold was a "modest" requirement, contrasted this with a hypothetical $1,000 spent "touching up the community."[110] If this hypothetical cost were paired with a disproportionate increase in rent, the Court reasoned, an arbitrator would be "justified" in not granting a rent increase.[111] The amount spent in this case is nearly three times that in *Sandhill*. The Arbitrator thus did not err in concluding that the amount spent was material.

---

[106] A0369; A0586; Appellee's Answering Br. at 6 (D.I. 38–39).

[107] A0371–83.

[108] A0585. The Arbitrator's analysis focused primarily on whether the expenses were incurred "for the benefit of the Community" rather than the materiality thereof—*i.e.*, the purpose of the expenditure, not how substantial the cost was. *Id.* While the former consideration may seem to bear more intuitively on whether an expenditure is directly related to operating, maintaining, or improving the community, it is the latter consideration that lies at the heart of the Supreme Court's materiality test. *See Sandhill*, 210 A.3d at 729. The Arbitrator, relying on substantial evidence, concluded that the costs were incurred for the benefit of the community. A0585.

[109] *Sandhill*, 210 A.3d at 729.

[110] *Id.*

[111] *Id.*

18

### ii. The rent increase was proportionate to the Landlord's expenditure.

The Arbitrator did not explicitly consider the issue of proportionality.[112] This was legal error.[113] The error, however, was harmless, because the Arbitrator found that the rent increase was "directly related," and the proper proportionality analysis supports this conclusion. The record contains substantial evidence of the income netted by the Landlord's rent increase. While neither party provided a total, and the Arbitrator did not mention one in his opinion, the amount in question can be calculated through the rent-increase notices that were turned over to the HOA during discovery. The rent increase detailed by these letters totaled $6,193.53 per month, or $74,322.36 annually.[114] In the first year, therefore, the Landlord realized a net return of 223.78 percent.

By contrast, the annual rent increase in *Sandhill* was $53,760, weighed against a $12,185 expense.[115] In other words, the *Sandhill* court approved a first-year net return of approximately 441.20 percent—nearly double that realized by the Landlord in this case. The rent increase before this Court is, accordingly, proportionate as a matter of law. Unlike a rent increase justified solely by a capital improvement, as permitted by 25 *Del. C.* § 7052(c)(1),[116] a rent increase justified by market rent is not capped to the amount expended by the landlord.[117]

---

[112] *See* A0584-85.

[113] *Sandhill*, 210 A.3d at 730.

[114] A0001–304.

[115] *Sandhill*, 210 A.3d at 729.

[116] *See Rehoboth Bay*, 252 A.3d at 444 ("where the cost of a one-time capital improvement is the justification for a rent increase, the justification for that increase ends when the cost has been fully recovered.").

[117] Interpreting 25 *Del. C.* § 7052(c)(7) otherwise would not only contradict the reasoning of *Sandhill* but would also render the provision functionally indistinguishable from § 7052(c)(1). Such interpretation is contrary to the Supreme Court's instruction to "consider the statute as a whole . . . read[ing] each section in light of all others to produce a harmonious whole." *Bon Ayre*

### iii. The Landlord saw its costs increase as a result of the expenditure, and those costs were likely to reduce its expected return.

Once a landlord makes a showing sufficient to satisfy the elements of materiality and proportionality, the landlord has made the *prima facie* case that its rent increase is directly related to operating, maintaining, or improving the community.[118] This *prima facie* case rests on a prospective analysis performed at the time the rent increase is proposed. Simply because a rent increase is taken to arbitration does not obligate the landlord to prove that, following the expenditure, its costs did, in fact, increase. This would be a retrospective analysis not contemplated by the Act. In *Sandhill*, the Supreme Court explicitly rejected the argument that a landlord would "have to affirmatively 'offer evidence about its *original* costs and *original* expected return and how the expenditure altered that relationship.'"[119] "There is no basis in the Act to infer such a requirement," the Court wrote.[120] Rather, "it suffices for the community owner to offer evidence that in making some capital improvement, the community owner has incurred costs that *are likely* to reduce its expected return."[121]

Once the landlord has made its *prima facie* case, the burden shifts to the party opposing the rent increase. Under *Sandhill*, to rebut the landlord's *prima facie* case, the petitioner must show that the expenditure "did not in fact reflect any increase in costs—for example because the expenditure was offset by reduced expenditures in

---

*II*, 149 A.3d at n.21 (quoting *Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del. 2011)). *See also Taylor*, 14 A.3d at 538 ("We also ascribe a purpose to the General Assembly's use of statutory language, construing against surplusage, if reasonably possible.").
[118] *Sandhill*, 210 A.3d at 729.
[119] *Id.* (emphasis in original).
[120] *Id.*
[121] *Id.* (emphasis supplied).

other areas."[122]  Moreover, these "reduced expenditures" must be rationally related to the expenditure that opened the door to the rent increase.[123]  In other words, an expenditure reflects an increase in costs when the landlord's costs are higher than they would have been had the expenditure not been made, not when costs are higher overall after the expenditure than prior to it.[124]

Interpreting the Act otherwise would discourage community owners from economizing, and irrationally penalize them for proposing rent increases the year after they suffer unusually high expenses (e.g., from cleaning up a natural disaster). This would "conflict with the Act's stated purpose,"[125] because it would neither minimize homeowners' rent nor help the community owner to realize a "fair return" on investment.[126]  In other words, it better comports with the Act's text and purpose to allow a landlord to make a material capital improvement (and receive an increase

---

[122] *Sandhill*, 210 A.3d at 729.

[123] In so holding, the Court is persuaded by the reasoning of *Wild Meadows MHC, LLC v. Wild Meadows Homeowners Ass'n, Inc. (Wild Meadows 2020)*, 2024 WL 1956135, at *4 (Del. Super. May 2, 2024) and *Wild Meadows Homeowners Ass'n, Inc. v. Wild Meadows MHC, LLC (Wild Meadows 2019)*, 2024 WL 3495769, at *5 (Del. Super. July 22, 2024).  These decisions are consistent with *Shady Park*, as explained fully *infra*.  S*ee also Shady Park*, 2023 WL 2366643, at *5.  "Wild Meadows 2020" and "Wild Meadows 2019" refer to the date of the proposed rent increases at issue in those cases, rather than the years those cases were decided.

[124] This holding does not foreclose a petitioner from seeking to rebut a community owner's *prima facie* case.  For instance, in a hypothetical case, homeowners could show that installing a more efficient boiler in the community's office would not increase overall costs, because it would result in energy savings.  Thus, if the return on investment for the capital improvement exceeds the landowner's expected return for the community as a whole, the capital investment would not be an increase in costs.  Reduced expenditures are also, as stated in *Sandhill*, just one example of a way to rebut the landlord's case. *See Weidman*, 250 A.3d at 759 (quoting *Sandhill*, 210 A.3d at 731–32) ("[B]oth sides of the community owner's financial statements bear logically on whether and to what extent a rent increase is 'directly related to operating, maintaining or improving the manufactured home community' under the Act.").  On the other side of the ledger, a capital improvement could generate new revenues.  Adding new roads and new pads for residences could be paid for by new revenue from a larger rent roll, for example.  If these increased revenues were likely to improve the community owner's expected return after accounting for the up-front expenditure, they would not justify a rent increase.

[125] *Rehoboth Bay*, 252 A.3d at 444.

[126] *See* 25 *Del. C.* § 7050 (stating that the Act's purpose is to balance these competing interests).

21

to market rent in exchange) while at the same time economizing in other areas to keep costs low and maximize its return—as opposed to encouraging multiple expensive and unnecessary capital improvements designed to keep costs on an upward trajectory from year to year, and thereby keep the door open for market rent.[127]

In recent years, this Court has held that expenses were "directly related" to operating, maintaining, or improving the community without comparing the overall costs incurred prior to and after a capital improvement. *Shady Park* held that the following reasoning, propounded by an arbitrator, was "legally sound":

> The arbitrator concluded that he could not accept the HOA's arguments about the previous versus current community owners' expected rates of return because doing so would "essentially rule out justification of a rent increase under § 7052(c) by a 'new owner by purchase' of a park, with no 'profit history,' who attempts a statutory rent increase following purchase."[128]

It was instead sufficient that "the expenditure likely reduced the expected return of the Owner due to the large amount of money allocated to the new office building" constructed on the property.[129]

Two recent decisions of this Court have persuasively interpreted *Shady Park* to require a causal relationship between a door-opening expenditure and offsetting reductions in expenses. In *Wild Meadows 2020*, this Court explicitly held that "offsetting expenses, as described in *Sandhill Acres*, refers to lowered expenses resulting from an expenditure, not merely an overall reduction in costs."[130]

---

[127] *Cf. Rehoboth Bay*, 252 A.3d at 444 (declining to adopt an interpretation that would "incentiviz[e] owners of manufactured home communities to perform as many costly capital improvements as possible so as to increase their revenue each year to whatever maximum limit the market will bear.").

[128] *Shady Park*, 2023 WL 2366643, at *5 (cleaned up).

[129] *Id.*

[130] *Wild Meadows 2020*, 2024 WL 1956135, at *4. For an explanation of the *Wild Meadows* case nomenclature, *see* Note 123, *supra*.

Accordingly, the Court reversed an arbitrator who had denied a rent increase because the landlord's "year-over-year costs decreased."[131] In *Wild Meadows 2019*, decided several months later, the Court again emphasized that "[h]omeowners seeking to prove the existence of offsetting expenses must show evidence that the expense itself reduced costs – by lowering ongoing maintenance costs, for example. Showing only that the community owner's overall costs decreased, however, does not suffice."[132]

Arguing that this Court should reject the reasoning of the *Wild Meadows* cases, the HOA asserts that "[n]owhere does the Supreme Court state the lowered costs must relate to the expenditure it made for the capital improvement[.]"[133] While this may be literally true, the causal interpretation of *Sandhill*'s "likely to reduce its expected return"[134] language is the most natural one. "Likely to reduce" implies both that the relationship is causal and that the analysis is prospective from the time the expense is incurred.[135] Consider an analogous construction: "an individual who commits a crime is likely to be arrested and prosecuted." An ordinary English speaker would understand that the writer does not mean that the individual will be arrested wrongly, or for an unrelated crime, but, rather, for the crime mentioned.

---

[131] *Id.* at *2–3, 5. The HOA in this case raises the issue that certain amortization and depreciation expenses were included in the Community's 2020 profit and loss report, whereas they had not yet been calculated for 2021. Appellant's Opening Br. at 21. As the *Wild Meadows 2020* Court reasoned, whether these "paper losses" are appropriate to consider is irrelevant to the Court's decision if only raised to argue that the Community is profitable; the legal test does not turn on whether the Community is profitable or not. *Wild Meadows 2020*, 2024 WL 1956135, at *5. Here, the Landlord does not contend that its costs increased following the expenditure *because its amortization and depreciation expenses increased*—there simply is no evidence of what those expenses were. Whether one assumes that the appropriate weight to be given to these expenses is nil or, as the Arbitrator did, infers that the costs would have been substantially the same in 2021, these costs have no bearing on the analysis. Thus, the Court need not determine whether the Arbitrator erred in considering them, as any error would be harmless.

[132] *Wild Meadows 2019*, 2024 WL 3495769, at *5.

[133] Appellant's Reply Br. At 10.

[134] *Sandhill*, 210 A.3d at 729.

[135] *See, e.g.*, *Likely*, *Black's Law Dictionary* (12th Ed. 2024) ("Apparently true or real; probable <the likely outcome>").

Likewise, the statement above is plainly a forecast of the future based on the writer's assessment of probability. If the individual in question did commit the crime, but was neither arrested nor prosecuted for some period of time thereafter, this would be relevant information to show that the forecast was wrong (*i.e.*, that the mentioned eventualities were not "likely" when the forecast was made). It would not, however, be dispositive, because a statement that something is "likely" admits the possibility, however unlikely, that something else will turn out to be true.

Nonetheless, the HOA points the Court to other language from the Supreme Court's 2021 *Weidman* decision. This language, it contends, militates for the opposite interpretation.[136] The *Weidman* court required, in relevant part, that the landlord's "original expected return has declined, because the cost side of its ledger has grown;" that its "costs have gone up;" and that it "has seen its costs increase for operating, maintaining, or improving the manufactured home community."[137] As a preliminary matter, this language is susceptible to either interpretation: in essence, must the "cost side" of the landlord's ledger have "grown" relative to *past years* (the HOA's preferred interpretation) or relative to *a hypothetical scenario* in which the expenditure was not made (this Court's causal interpretation)?

Perhaps more importantly, *Weidman* was a case about a discovery dispute, rather than about the analysis of materials that had already been discovered. The Court held that those challenging a rent increase have a right to compel disclosure of the landlord's business records.[138] This was necessary so that the homeowners could "'fairly test' the community owner's proffered justifications."[139] Thus, the Supreme Court's analysis was tailored to resolve a narrower issue than the point the

---

[136] Appellant's Reply Br. at 11–14 (D.I. 41–42).
[137] *Weidman*, 250 A.3d at 758 (quoting *Bon Ayre II*, 149 A.3d at 234–35).
[138] *Id.* at 760.
[139] *Id.* at 758 (quoting *Donovan Smith*, 2018 WL 3360585, at *3).

HOA hopes to prove with its quotation.

The HOA's quotation is also selective. For instance, the *Weidman* Court also quoted *Bon Ayre II*'s formulation that homeowners should be "protected from material increases in rent *unrelated* to the benefits and costs of living in the community."[140] Another passage from *Bon Ayre II* quoted by the *Weidman* Court asserted that "[i]f a landowner invests in its development, and therefore has improved the community, it can also reap the reward from that investment through higher-than-inflation rent increases."[141] Viewed in its full context, the language quoted by the HOA expresses only one of the conflicting interests the Court was attempting to balance.[142]

The HOA further argues that ruling, as the Court does today, that a landlord's total costs are irrelevant to the "directly related" analysis would lead to a parade of horribles. Doing so, per the HOA, "would allow a community owner to raise rents *every time* it replaced an old carpet regardless of its cutbacks in operation and maintenance costs in other areas . . . . [E]very trivial repair and replacement would provide a basis for a rent increase."[143] The concerns the HOA raises are serious, but rest on a misapprehension of the relevant law.

Under the holding reached today, "every trivial repair and replacement" does not open the door to a rent increase, for three reasons. First, as previously explained at greater length, the expenditure made by the landlord must be "material" rather than "trivial."[144] Second, if an expenditure is used to justify an increase in the rent to the market rate, this increase must be proportionate to the amount expended:[145] if

---

[140] *Id.* (quoting *Bon Ayre II*, 149 A.3d at 235) (emphasis supplied).
[141] *Id.* (quoting *Bon Ayre II*, 149 A.3d at 234).
[142] *Id.* at 759 (noting that the Act's "stated goal" was to "balance[e] the homeowner's and community owner's competing interests.").
[143] Appellant's Reply Br. at 13 (D.I. 41–42) (emphasis in original).
[144] *See* discussion *supra* Section IV(b)(2)(i).
[145] *See* discussion *supra* Section IV(b)(2)(ii).

an increase to the market rate would be disproportionate, the landlord would be required to rely on one of the seven remaining justifications allowed by 25 *Del. C.* § 7052(c). Third, if a landlord attempts to justify a rent increase by reference to a "capital improvement or rehabilitation work in the manufactured home community,"[146] rather than the market rent, the landlord must show that the expenditure is not for "ordinary repair, replacement, and maintenance,"[147] and even if a landlord clears this threshold, the increase is only justified to the extent that it recoups the landlord's investment.[148]

---

[146] *See* 25 *Del. C.* § 7052(c)(1).

[147] *Id.*; *Rehoboth Bay*, 252 A.3d at 442 ("[I]t makes sense to characterize an 'ordinary repair, replacement, and maintenance' as a regular, normal, and usual repairing of property, while a 'capital improvement' is to acquire a long-term, nonrecurring asset or improve or enhance such an asset already in existence.").

[148] *Rehoboth Bay*, 252 A.3d at 444 ("[W]here the cost of a one-time capital improvement is the justification for a rent increase, the justification for that increase ends when the cost has been fully recovered . . . . [§ 7052(d) of the Act] expresses an intent that a community owner may not obtain multiple recoveries, year after year, of the cost of the same capital improvement.").

## C. The Arbitrator's Finding That Market Rent Justified The Rent Increase Is Free of Legal Error And Supported By Substantial Evidence

The Arbitrator ultimately concluded that the Landlord's proposed rent, $505.00 per month per lot,[149] was justified by the market.[150] This conclusion was supported by substantial evidence. Testimony established that $505.00 was the amount charged to the last ten homeowners to move into the Community.[151] The Appraiser's report, considering both these facts and the rates charged by similar communities, estimated that market rent for lots in the Community ranged from $505.00 to $525.00 per month.[152] The HOA, though, argued that the evidence just described could not support the Arbitrator's finding because it was tainted by the bargaining power of the Landlord and other community owners.[153] After full consideration, the Arbitrator was unpersuaded by this argument.[154] On appeal, the Court will not hold that the Arbitrator should have disregarded the evidence before him, nor that, as a matter of law, he was required to adjust it to account for landlords' bargaining power.

At arbitration, the HOA argued that the Appraiser, and by implication the Arbitrator, should have done more to account for the unequal bargaining position of the Landlord and homeowners.[155] The HOA asserted that a landlord could

---

[149] A0599. *See also* A0600 (concluding that, though the Landlord initially proposed to charge a CPI-U adjustment on top of the $505.00 market rent, "it is . . . clear that the Landlord has not charged the affected homeowners rent that exceeds the $505.00 market rent."). The Arbitrator described the original proposal as a "miscalculation," and the Landlord has not pursued a right to an additional CPI-U adjustment either before the Arbitrator or on appeal. *Id.* For this reason, the Court does not consider whether the Landlord was entitled to a CPI-U adjustment.

[150] A0601.

[151] A0591; A0784.

[152] A0388.

[153] A0589.

[154] A0589–93.

[155] A0589–93.

effectively drain the equity from homes that would be difficult and expensive to move by raising rents for incoming homebuyers.[156] Phrased differently, a prospective manufactured home buyer will pay less up-front for a home with a higher lot rent. The benefits of raising rent rates would redound to the landlord, while the costs would fall on the selling homeowner. This is a plausible theory, raising many of the same concerns motivating the Act.

Notwithstanding the merits of the HOA's theory, the Arbitrator was not obligated to accept it, and the Court may not limit the types of evidence used to prove the market rent to an arbitrator absent statutory authority. The Court is particularly hesitant to impose such restrictions when doing so would render it all but impossible for a landlord to justify a rent increase. In *Bon Ayre II*, the Superior Court held that comparisons to rents charged at other communities, when used to justify a "market rent" increase, must be "actual" rents, as opposed to "advertised" rents before negotiation.[157] On appeal, the Supreme Court reversed: "The Rent Justification Act does not limit what is relevant to showing market rent to actual lease terms, nor do the Delaware Rules of Evidence."[158] Taking an even stronger position, the Court added that the Superior Court erred by

> materially rais[ing] the threshold for evidence to prove one of [§ 7052(c)'s] factors without a basis in the text of the Act. To the extent that this judicially created standard makes it essentially impossible for a landowner to prove the market rent factor, the Superior Court's interpretation also raises constitutional due process concerns by subjecting landowners to restrictions on their property rights without a fair way to prove a relevant statutory factor that could ease the restriction.[159]

---

[156] A0590.

[157] *Bon Ayre Cmty. Ass'n, Inc. v. Bon Ayre Land, LLC*, 2016 WL 241864, at *10 (Del. Super. Jan. 12, 2016).

[158] *Bon Ayre II*, 149 A.3d at 237.

[159] *Id.*

Accepting the HOA's bargaining power argument would raise the same concerns the Supreme Court cited in *Bon Ayre II*.  Doing so would "materially raise the threshold" for admissible evidence of market rents "without a basis in the text of the Act" and thereby "make[] it essentially impossible for a landowner to prove the market rent factor."[160]

The implications of accepting the HOA's bargaining power argument are evident from the evidentiary issues the Arbitrator confronted.  Owners of comparable communities, just like the Landlord, arguably have power over new homebuyers when the home is already located in the community.  Thus, accepting the HOA's premise, neither advertised *nor* actual rent rates for lots with existing manufactured homes would reflect a fair market rent, regardless of the community in which they are located.

For this reason, the Arbitrator found that extending the HOA's theory would mean that only the rates charged for vacant lots would be usable as evidence of market rent.[161]  The Arbitrator noted that "not all communities have vacant lots, and those that do may only have limited vacancies.  Canterbury Crossing, for example, has 94.3% occupancy.  *It would, thus, be difficult, if not impossible, for a landlord to ever meet this requirement if vacancy rates were low or non-existent.*"[162]  This factual statement was supported by substantial evidence.  The Appraiser's report, included in the record, indicated that many communities had limited or no

---

[160] *Id.*  25 *Del. C.* § 7052(c) provides a nonexclusive list of "relevant considerations" to determine market rent.  *See* Antonin Scalia & Bryan Garner, *Reading Law* 112 (2012) ("The verb 'to include' introduces examples, not an exhaustive list."); *accord* Legislative Council Division of Research, *Delaware Legislative Drafting Manual* 112–14 (2022).  Specifically mentioned are "rents charged to recent new homeowners entering the subject manufactured home community and/or by comparable manufactured home communities."  25 *Del. C.* § 7052(c).  The statute does not limit either category, or the broader class of "relevant considerations," to vacant lots.
[161] A0591.
[162] A0592 (emphasis supplied).

vacancies.[163]  The Appraiser also testified that he did not know which residents of the Community and other comparable communities he reviewed purchased existing homes, rather than bringing their own.[164]

The Arbitrator justifiably found that "the Apex Report may reasonably rely on the recent rents for lots within the Community and comparable communities regardless of whether those lots are currently occupied by existing homes without an adjustment for the 'unequal bargaining power.'"[165]  For the reasons just stated, this conclusion was without legal error and supported by substantial evidence.

The HOA also challenged the determination of market rent on the ground that the Appraiser did not account for persistent, and arguably intractable, flooding in some areas of the community.[166]  The Arbitrator gave the HOA's arguments due consideration but rejected them on the basis of substantial evidence.  The Court will not overturn this factual finding.

Two reasons for the Arbitrator's decision are evident in his opinion: The Appraiser testified that the flooding issues, if known to him, would not have impacted his report;[167] and the Arbitrator questioned the extent of the drainage problem that persisted.[168]  The Arbitrator made his findings after hearing extensive

---

[163] A0393.

[164] *See* A0867 ("Can't discern.  Wasn't available to us" with regard to the Community); A0878 ("I do not know if they bought a home in that community or if they brought their own."); A0889 ("I told you that I do not know if they brought their own personal property or if they bought somebody else's.  We couldn't discern that necessarily."); A0895–96 (stating that the Appraiser did not ask for data on comparable communities beyond the "rack rates.").

[165] A0593.

[166] *Id.*

[167] A0593–94 ("[The Appraiser] testified that he would not be able to make a subjective percent adjustment to the market rent based on the drainage issues . . . . I do not find his analysis unreasonable . . . . [R]eal estate valuation is often an inexact science.") (internal citation omitted).

[168] *See, e.g.*, A0585 (noting that a video was recorded during or immediately after a tropical storm). This finding was consistent with a stipulation of the parties as to the date of the video.  A1111–16. Moreover, the date of the storm was appropriate for judicial notice under D.R.E. 201.  *See In re Estate of Lomker*, 1997 WL 907995, at *1 (Del. Ch. Dec. 15, 1997) ("judicial notice may be taken that the winter of 1995-96 was one of the worst in the century in this part of the country"); 29 Am.

testimony from the Appraiser about his report and methodology[169] and after the community manager,[170] the president of the HOA,[171] and the vice president of the HOA[172] testified about the flooding issue. The Arbitrator was also provided with photographs taken before the contractors began their work on the drainage issue, as well as photographs and a video taken afterwards.[173] It is unclear from the record which of the ten leases relied on by the Appraisal (each at $505.00 per month) may have been affected by flooding, if any of them were. Only one witness, who was professedly uncertain, and whose knowledge was incomplete, addressed this question.[174]

It may be that the evidence cited by the Appraiser and relied upon by the Arbitrator was, in the latter's words, "probably not perfect."[175] Nonetheless, and recognizing these limitations, the Arbitrator found that the Appraiser's report made "fair" comparisons to other communities, and that it was "reliable."[176] When conducting substantial evidence review on appeal, "this Court will not weigh the evidence, determine questions of credibility, or make its own factual findings."[177] "Only when there is no satisfactory proof to support a factual finding . . . may the

---

Jur. 2d Evidence § 164 ("Judicial notice may be taken as to . . . facts contained in weather reports regarding rainfall in a county and the surrounding region . . . [and] facts relating to hurricanes and typhoons.").

[169] *See generally* A0821–926.

[170] A0939.

[171] A1121–23; A1126–29; A1135.

[172] A1027-66.

[173] A0584–85.

[174] A1130–31 (testimony by HOA president that "I don't know how many homeowners have moved. Because there are areas here that are not that bad . . . . I don't know how many they move[d], but some of them that I know they moved here, they didn't move into an area where there's a lot of flood . . . . I know some of them, where they moved in. And this -- it's an area where there's no flooding. I, I talked to them.").

[175] A0594.

[176] *Id.*

[177] *Zayas v. State*, 273 A.3d 776, 785 (Del. 2022) (quoting *Roos Foods v. Guardado*, 152 A.3d 114, 118 (Del. 2016)); *see also Powell v. OTAC, Inc.*, 223 A.3d 864, 870 (Del. 2019).

Superior Court . . . overturn that finding."[178]  While the Court may not have reached the same conclusions as the Arbitrator if this case were presented in a different procedural posture, it will not reweigh the evidence or disturb the Arbitrator's credibility judgments on appeal.  As previously stated, the Arbitrator's conclusion that the Appraiser's report was a "fair" and "reliable" indicator of value is supported by substantial evidence.

## V.     CONCLUSION

In sum, the Court finds that the Arbitrator's factual findings were supported by substantial evidence and that any legal error was harmless.

**WHEREFORE**, the Arbitrator's decision of March 28, 2022, is **AFFIRMED**.

**IT IS SO ORDERED.**

_____
Noel Eason Primos, Judge

NEP/tls
*Via File & Serve Xpress*
oc:  Prothonotary
cc:  Counsel of Record

---

[178] *Powell*, 223 A.3d at 870 (quoting *Noel-Liszkiewicz v. La-Z-Boy*, 68 A.3d 188, 191 (Del. 2013)).